The next matter, number 191764, Edward A. Cagniglia v. Robert F. Strom et al. I thought they were noticing me. Don't take it personally. Okay. Good morning, your honors. May it please the court, I am Thomas Lyons and with Rhiannon Huffman as cooperating attorneys with the American Civil Liberties Foundation of Rhode Island on behalf of the plaintiff and appellant Edward Cagniglia. Your honor, the federal and state constitutions as well as state statutes forbid the police from seizing people and property from their homes without a court order, without a doctor's certification, without any exigent circumstances and without consent. But that is exactly what happened here and that is the action that the district court upheld and which we are appealing. Moreover, the police may not require a person to have a psychological evaluation at significant personal expense simply because his wife may have a concern about his well-being. Rather, the constitution requires that the police have probable cause to seize the person for a psychological evaluation which they did not have here and the Rhode Island mental health law requires that defendants have a court order or a doctor's certification or at the very least certify in writing that there was an imminent likelihood of serious harm for their seizure of the plaintiff. They did not have that here and that is undisputed. It is undisputed for several reasons. First, the only expert witness in the case, plaintiff's expert psychologist with a specialty in suicidology has said that in fact the plaintiff was not suicidal, did not make suicidal comments and the defendants ignored their own training and procedures in seizing him. They may have ignored their own procedures in seizing him but we do not impute the ultimate diagnosis by a professional psychologist to the police. Are not the police able to act on what they reasonably perceive to be an imminent risk as opposed to what a psychologist after the fact tells them was not a risk? Except in this case the police had their own general orders which in the words of their colonel is their bible which they did not follow. They had their own training on mental health issues which included numerous risk factors for suicide which they did not follow. In fact the sergeant who made the decision to seize Mr. Cornelia and require him to have a psychological evaluation testified he remembered none of that training. He did not consult with anyone. He went on to quote his experience to that point which is a purely subjective criteria. And for that reason it is not reasonable here. There are some facts here that independent of what the training is or isn't do distinguish this from a range of cases in which one might be concerned about the mental health of the person who seized in the sense that here the person had a gun, put the gun down and made comments that certainly alerted his wife to the concern that he might be suicidal. Well first of all it was an unloaded gun so clearly nobody could reasonably think he was going to shoot himself with an unloaded gun. Not right at that moment. Right but if he wanted to he had a magazine for the gun. He could have put the magazine in the gun. It was stored in the same location. So if in fact he was suicidal at that moment that's what he would have done. He would have put the magazine in the gun. What he was doing was making a dramatic comment in the same sense that you might say shoot me now, hold your fingers in the shape of a gun. I'd react differently if you had just done that with an actual gun. I would have reacted differently if the motion you just made was with an actual gun. If it was with an actual gun that was loaded yes that might be considered different. In this case he didn't actually make a suicidal comment. He said shoot me now. He didn't say I'm going to shoot me now. He handed his wife or pushed towards her an unloaded gun. Wasn't there a further comment in the colloquy with police officers later where he said something like it doesn't matter? Something like that? No what he said was that she didn't understand what I meant. He admitted that he did that as a dramatic point during the argument he was having with his wife. But he did not make a suicidal comment. In fact the police officers all admit he never threatened to shoot himself and never has threatened to shoot himself. He has no history of suicidal threats. He has no history of suicidal attempts. There is no reasonable basis here to infer that this was a genuinely suicidal threat. In fact if it was a genuinely suicidal threat that would be an exigent circumstance. That would be an emergency. Because he had a gun, he had ammunition, he was making a suicidal threat. But at all argument below the defendants acknowledged they were not arguing exigency. They were not arguing an emergency. On the issue of seizure, what's the state of the summary judgment record on whether the defendant was taken voluntarily or involuntarily for the competency evaluation? He was taken involuntarily. I know you say that, but where do I find that in the summary judgment record? Well there are two things. One is the sergeant who made the decision to seize Mr. Cornelia admitted at deposition, and it's in the record, that it was an involuntary... Was it before the district court at summary judgment? Oh yes, it was. And moreover what Mr. Cornelia said was the only reason he agreed to go for the evaluation was because they said otherwise they would seize his guns. And then they seized his guns anyway. So that was a coercive tactic to obtain the firearms which resulted in him having this psychologically unnecessary, completely unnecessary psychological evaluation that cost him almost a thousand dollars. Moreover the community caretaking function does not apply here. And it does not apply here for several reasons. The first is neither the U.S. Supreme Court nor the Rhode Island Supreme Court have ever said it applies outside the scope of an automobile search. But this court has. Well this court hasn't said it applies. This court has not actually decided. The court has said that there is no clearly established law to the contrary and has granted qualified immunity to police officers who enter the home to carry out community caretaking functions in the face of a claim similar to the claim that's being made here. And indeed that decision was made and that law established in this circuit within a few weeks before this incident occurred. Right. So that's the state of the law in the First Circuit in 2015. Right. I think it's still the state of the law in the First Circuit. Well I assume you're talking about the Madelon versus Hines case. McDonald against Townsville. I'm sorry McDonald. Yes. And this is what I would say about that decision. First of all it did not consider nor was it apparently argued to this court what the state law was on that issue and perhaps it wasn't relevant. Our point is that in fact the laws of the community determine the scope of the community caretaking function. Do you agree on that point? Yes. Good. So in fact we have here three statutes plus a number of Rhode Island Supreme Court decisions all of which indicate the police do not have this authority. Moreover in the McDonald case what they did was they entered the house. This case goes beyond that. In this case they entered the house, they seized Mr. Cornelia and they seized his firearms. It's more than just an entrance. There are two seizures involved here too. The point you had made was your statement that the community caretaking exception has never been applied except in the automobile context was simply pointing out to you that in the First Circuit that's a misstatement of the law. Well actually respectfully Your Honor I would disagree. What I think the court said in that case was in fact the court expressly declined to adopt the community caretaking function there. What they said was that the law is unsettled and that's why they get qualified immunity. But this court has never said the community caretaking function applies in these circumstances. Do you have some claims against some defendants to which the qualified immunity defense doesn't apply or not? Well the City of Cranston's not entitled to. So with respect to that claim this point matters greatly to you then right? In other words there is no case that we could rely on to resolve the City of Cranston claim under the community caretaking function without us holding for the first time. In fact the Supreme Court has said otherwise that municipalities do not get qualified immunity. So we have to make that new holding in order for you to lose. Correct. And I think you'd have to, as I understand it you'd have to overrule the Supreme Court which I don't think you can do. No, no, no, not on the City of Cranston on the community caretaking function applying. Oh the community caretaking function applying. In other words we may have precedent that says that there's qualified immunity with respect to it but as the City of Cranston claims we can't rely on the qualified immunity to resolve the case. So the only way to do it is to make a holding one way or the other. Can the community caretaking function extend beyond the automobile circumstance? That's correct. And it is quite clear to me that Rhode Island law would not permit that. And our point is that if it's a community caretaking function then the laws of the community ought to control. Which means that if Rhode Island says we're going to have more restrictions on what the police can do than some other jurisdiction, then in fact that limits the scope of the community caretaking function. Setting that aside, the state law point, is there any reason why it shouldn't extend beyond the automobile circumstance? If the state is willing to allow community caretaking to extend? Well the U.S. Supreme Court has made clear that they draw a line between automobiles and houses with respect to the right to privacy. What we have here is a purely domestic disagreement in which the police essentially commandeered the situation, went far beyond what Mrs. Cornelia asked them to do and decided that they were going to seize Mr. Cornelia and seize the firearms. Without a court order, without a doctor's certification, without any exigent circumstances and without consent. There is no reason under any of the cases, U.S. Supreme Court, Rhode Island Supreme Court, which would say that the police can intrude on the privacy of the home in that manner. But shouldn't the criterion on the scope of community caretaking look to whether or not there is a situation claimed in which the police are in what colloquially we would call a damned if you do, damned if you don't situation. If they don't take the guns for example here and he either commits suicide or in fact might even use them on his wife after all. She didn't want to spend the night there anymore. Whereas on the other side they are indeed going into a house without a warrant. But isn't that the same kind of situation with higher stakes than the situation in which they are out on the highway somewhere and they have to do something about the car of the person they have just arrested. If they leave it on the highway and things are stolen or the car is stolen, they are in trouble. If they don't leave it on the highway and they ultimately discover evidence as a result of the search incident to taking it into custody, there is a Fourth Amendment claim against them. Aren't we in that same kind or weren't they here in that same kind of situation? No. And the reason is first of all Mrs. Cornelia told the police she did not fear for her own safety. That's in the incident report. She was not concerned about her husband harming her. All she wanted was a single police officer to go with her to the house to check on her husband's well-being. They went far beyond that. In fact, they called him before they went to the house and told Mrs. Cornelia, quote, he was fine. Then they went, they spoke with him on the back deck, and by all accounts, their own, he was fine. He was not suicidal. He was normal. He was cooperative. There was no indication from their conversation with him on the deck of the house that he was suicidal. The colonel of the Cranston police admitted that at his deposition. Nothing he said to them indicated he was suicidal. Thank you. Good morning, Your Honors. Mark DeSisto for the Appalese, the City of Cranston, and the police officers. I'd like to address the court first of all on the Fourth Amendment claims in two regards. We advocate for two separate holdings today. The first holding is generally that the community caretaking function definitively applies to residents. I'd like to go back to the McDonald case, Judge Selya, because in that case you granted qualified immunity. I think, Judge Barron, you've indicated that that would not exonerate Cranston here, so we need a ruling. I'd like you to follow, Judge Selya, what you did in the Madelon case, which came after that, where you looked at it and said, assuming without deciding that the community caretaking function applies, we're going to analyze this. You've analyzed it and found that it didn't apply in those circumstances. The first goal of the Appalese here is to ask this court to definitively determine that the community caretaking function applies to residents. I think if one looks at it from a public policy aspect, what does it mean to apply it to residents? In other words, I understand the reason not to have an absolute rule that an officer can never go in for a non-investigated purpose to make sure that somebody is well, that there's a problem with such a categorical holding. Nonetheless, it's not like an automobile. It is a very, very intrusive thing. And then here, on top of that, we're dealing with a seizure, in which the seizure is not even just a typical seizure. The seizure is to force the person to have a mental evaluation, which is a particularly intrusive type of seizure. So what does it mean to say there's a community caretaking function to do that type of intrusive act? What are the standards that should regulate that? That's a good question, and it means we go back to the standards that are articulated in 1991 by Judge Sully in Rodriguez v. Morales, where the community caretaking function, wherever it's applied, has to be applied in the realm of reason, and it has to be reasonable. So I understand that when you're intruding in someone's home, there's a higher standard. And so what's reasonable in an automobile may not be reasonable in the home, but that's a decision that the court makes on a case-by-case basis, and that's all we're looking for here. Well, I think you're looking for a little more because you want us to apply it to this case. So I guess what I'm really asking is, given this situation in which the intrusion takes the form of a seizure to a compelled mental health examination on pain of losing your property, and a protected property item in particular, from the house, what is the threshold that the police officer needs to have met in order to be able to do that without any court approval or anything, or to qualify as acting reasonably in pursuit of a community caretaking function? Well, the officer has a good, reasonable basis to determine that there is an imminent threat of harm to anybody. I think that's what occurred in this case, that the officers in this case, based upon the core facts, the material facts, determined that there was some need to do two things, to seize those weapons and to send Mr. Cornelia for an evaluation. And I think it's based upon material facts that aren't in dispute, and they're very basic, that this person had a weapon in the house, that he put it on the table, that he said to his wife, why don't you just end it and shoot me, that they knew she was so impacted by that, that when he left the house, she hid the gun and the magazine in a different spot, that when he came back, she left the house, she went to a hotel room, and that she said that he was depressed. I think those core facts allow an officer to use her community caretaking responsibilities to make that judgment call. And I want to highlight that it doesn't, and this was said in Rodriguez v. Morales, which I hope to quote many times in this short argument, it doesn't have to be the least intrusive means, it has to be reasonable. And I think here it was reasonable to do that. There really is a difference between circumstances, but if this was an involuntary commitment case, what would be the constitutional standards that would limit the ability to do an involuntary commitment? Well, I have to go back, I think, if I look at the... Is there a reason why they should be different than that, given the nature of this seizure? And if so, what is the... I think involuntary commitment usually concerns the ability, you have some time. I think in this particular case, the community caretaking responsibilities or obligations come in because they have to make a split-second decision. What do we do in this case? Do we just go? We're between a rock and a hard place. If we just leave and then seek an involuntary commitment through the regulatory means, is it going to be too late? And I think that's where the community caretaking function comes in, and it has to be centered on reasonableness. And I think here it was centered on reasonableness. If I can just go back to one, it's interrelated to this, Judge Barron. I know my colleagues say, look, it violated state law, and whether it does or not, and we've argued in the brief that it doesn't. If you go back to the origin of this in Cady v. Dombrowski, they say that the community caretaking function has its origin in state law or sound police procedure. And this court has identified sound police procedure, I think in the Koshia case, C-O-C-C-I-A, as an officer's ability to choose freely among available options so long as those options are reasonable. And so I think generally what we have, if you adopt that the community caretaking function applies to homes, you have this standard of reasonableness. And then when we go to this case, I think based upon the core facts here, it was more than reasonable to do what the officers did here, and that they ought to have that ability. If I can just add, the real issue in this case, the actual issue, is whether or not there was an efficient means to return those weapons. And the district court down below found a 14th Amendment violation saying that there wasn't an efficient manner, that it violated the Constitution. We didn't appeal that. We accept that. That issue wasn't before us. Go back to this community caretaking exception. I'm still not clear on whether there was a seizure in this case in connection with the mental evaluation. My understanding of the summary judgment record, which may be incomplete, is that there was consent to this evaluation. And I understand there is now a claim that that consent was obtained through trickery in the sense that the plaintiff was led to believe that if he didn't consent, his guns would be taken away. Is that the state of the summary judgment record? I'll address that in two ways, Your Honor, if you'll indulge me. One is that there is a question of fact as to whether or not the plaintiff says that he was tricked because the officer said, we will leave the guns if you go. That's number one. The judge in the lower court, Judge McConnell, determined in his decision that the record didn't show that the seizure was not voluntary in that there were no facts to show that he openly or outwardly was opposed to that. But if I could just go beyond that, I'm not looking for the court to get caught up in that because I think the seizure was reasonable under the community caretaking. I understand you do, but I'm curious as to why we should grapple with that if, as I understand the record, the evidence is that the plaintiff consented. Now, I understand there may be an issue as to whether the consent was obtained by trickery, but is there evidence that he did not consent in the summary judgment record? Well, speaking for the city of Cranston, I hold to what Judge McConnell found that there was an absence of record in there, but I must tell you that I didn't. I'm looking for the court here that the seizure was fine. With respect to the trickery issue, which would be the thing, you're inferring that you're suggesting might defeat the consent. Might defeat the consent, yes. You don't make any argument in response to that. In other words, you don't, to us, argue that their contention that the district court was wrong insofar as it found it was consensual because of trickery. You don't make any argument that you're defeating that. The only argument I make is that I think Judge McConnell was right, but I don't want to get into questions of fact about, I know that the plaintiff claims that he was told he could keep his guns, and that's why I don't want to go down that route. Do the officers deny that claim? Yes, I think they do. So that's where we are here. The last point on that, just because it may matter to what we have to decide, the only argument, as you understand it, that's made as to why it was not consensual was one of trickery, not a contention that the conditionality of seizing the guns was itself something that made it coercive. Well, they're one and the same, aren't they? Maybe I'm getting this wrong. No, you could trick someone. Say something, I'm going to do something that's not true. Alternatively, I can tell you the truth. I'm going to take your guns unless you go for an evaluation. And you might say that kind of conditionality makes it coercive because why do I have to give up my gun? I mean, I'm a free person. I see that. No argument of that second type is made to us in challenging the consensual nature. Is that right? That's correct. As I say, I'm urging you to go then. And I just want to, I know I don't have much time, but the reason I brought up the 14th Amendment claim that we're not appealing is if the cities and towns in Rhode Island, and we're working on it, have an efficient means to return the guns, then I think situations like this where guns are seized become more reasonable because there's an effective means to return them. We didn't have it. We acknowledge that. We're working on it. Other than that, unless there are any questions, I will thankfully sit down. Thank you.